MYRNA GRAF,
      Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
      Defendant.

No. 3:18-cv-00093 (SRU)

**RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS**

      In this Social Security appeal, Myrna Graf moves to reverse the decision by the Social

Security Administration ("SSA") denying her claim for disability insurance benefits. The

Commissioner of Social Security moves to affirm the decision. I conclude that Graf's arguments

for reversal lack merit and that the Administrative Law Judge ("ALJ")'s decision that Graf could

perform medium work was supported by substantial evidence. Therefore, I grant the

Commissioner's motion and deny Graf's.

## I.      Standard of Review

      The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe

impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc.*

*Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts

Myrna Graf filed an application for Supplemental Security Income benefits on July 2, 2015. ALJ Decision, R. at 22. In her application, Graf alleged a disability onset date of December 1, 2014. At the time of the alleged disability onset, Graf was 56 years old. Graf identified her disability as "fractured right wrist – cannot hold writing utensils; right side and left foot injury; condritis in left hand, wrist, arm, and shoulder; constant pain in limbs and hands; twisted right ankle and knee pain; difficulty on right ankle cannot bend; cannot sleep; back pain; nerve tingling on head." Disability Determination Explanation, R. at 1040. The SSA initially denied her claim on September 11, 2015, and again on reconsideration on January 14, 2016, finding that "[Graf's] condition [was] currently severe…but it [was] expected to improve and [would] not result in significant limitations in [her] ability to perform basic work activities." Disability Determination Explanation, R. at 1047. The SSA also noted that Graf's condition was

"not expected to remain severe enough for 12 months in a row to keep [her] from working." *Id.* In making that determination, the SSA noted consideration of medical evidence, Graf's statements, and how her condition affected her ability to work. *Id.*

Graf requested a hearing before an Administrative Law Judge ("ALJ") on February 1, 2016, and a video hearing was held before ALJ Martha Bower on January 23, 2017. ALJ Decision, R. at 22. At the hearing, the ALJ questioned Graf about work history, her conditions, treatment history, and ability to perform daily working and living functions. Tr. of ALJ Hr'g, R. at 1019–1034.

Graf responded that it had become "very, very difficult" to prepare a simple meal. *Id.* at 1025. Further, she testified that her "whole body [was] in different kinds of pain" except for her hair. *Id.* at 1026. In addition, she had "a feeling that [her] foot [was] being cut in half" and that her boot brace alleviated that pain. *Id.* at 27. She also testified that she felt like a dog was biting her when she was not wearing the boot. *Id.* She felt like her "bones [were] being cut off" and that her skin felt like it was burning. *Id.* at 1027. She also testified that she could no longer change her sheets, worship, or walk to the park. *Id.* at 1029. She further testified that she could no longer grip a pot using her right hand or use that hand to prepare a simple meal such as pasta, and that her left hand would become swollen with minimal use. *Id.* at 1033. She also testified that she had been experiencing coughing attacks and had sprained her hand. *Id.* at 1034.

The ALJ then heard testimony from Vocational Counselor Larry Takki. The ALJ asked Takki to consider a hypothetical individual of the same age, education, and experience as Graf, who was limited to performing work with the following limitations: could occasionally push and pull bilateral hand controls and occasionally climb stairs, ramps, ropes, ladders, and scaffolds. Tr. of ALJ Hr'g, R. at 1035. The ALJ asked Takki whether that hypothetical individual could

perform any medium jobs with those limitations, and he testified that industrial cleaner and dining room attendant were the two jobs that this hypothetical individual could perform. *Id.* at 1035. The ALJ then asked Takki whether an additional limitation in concentration, persistence, or pace limiting them to the ability to understand, remember, and carry out simple tasks would affect Takki's answer. *Id.* Takki testified that those two jobs would still be viable options. *Id.* Takki also testified that a hypothetical person who was off task 5% of the work day, and additionally if that person needed to miss one work day each month on an unplanned basis, would still be employable according to his professional experience. *Id.* He also testified that if a hypothetical person had to arrive late or leave early one day each month, she would still be employable. *Id.* He stated that, according to his professional experience, someone arriving approximately half an hour or an hour late twice a month would cause a person to lose her job after a few months. *Id.*

The ALJ then changed the hypothetical, adding that the hypothetical individual: would have to avoid concentrated exposure to pulmonary irritants. *Id.* Takki testified that those two jobs could still be performed in that scenario. *Id.*

On March 8, 2017, the ALJ issued an opinion in which she found that Graf was not "under a disability, as defined in the Social Security Act, since July 2, 2015." ALJ Decision, R. at 34. At the first step, the ALJ found that Graf "ha[d] not engaged in substantial gainful activity since July 2, 2015, the application date." *Id.* at 24. At the second step, the ALJ determined that Graf's impairments of "status post right scaphoid fracture, left lateral epicondylitis, degenerative joint disease, degenerative disc disease, osteoarthritis, asthma, concussion, and fibromyalgia" were severe impairments that "had more than a minimal effect on [Graf's] ability to perform basic work activities for a continuous period of 12 months." *Id.*

At the third step, the ALJ determined that Graf "[did] not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments." ALJ Decision, R. at 25. In making that finding, the ALJ considered whether any of Graf's impairments met or medically equaled listing section 1.02 (dysfunction of the joints due to any cause). *Id.* at 25. The ALJ found that the impairments did not, because the record did "not show an inability perform fine and gross movements effectively." *Id.* The ALJ also determined that Graf's impairments did not meet or medically equal listing section 1.04 (disorders of the spine). *Id.* The ALJ found that they did not, because the "available objective medical findings…[did] not show evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis with pseudoclaudication." *Id.* at 25–26. The ALJ considered listing section 1.07 (fracture of an upper extremity), but found that there was "no evidence to suggest nonunion of [Graf's] scaphoid fracture." *Id.* at 26. The ALJ considered listing section 3.03 (asthma), but did not find asthma. *Id.* The ALJ also evaluated listing section 11.18 (traumatic brain injury), but found that "[t]he limited evidence regarding [Graf's] concussion [did] not satisfy the requirements of listing 11.18." *Id.*

The ALJ then assessed Graf's residual functional capacity, and found that she could "perform medium work" with certain limitations. *Id.* at 27. The limitations were that Graf: could occasionally push and pull bilateral hand controls and occasionally climb stairs, ramps, ropes, ladders, and scaffolds; and that she should avoid concentrated exposures to pulmonary irritants. *Id.*

The ALJ determined that Graf's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." ALJ Decision, R. at 28. However, the ALJ decided that "[Graf's] statements concerning the intensity, persistence[,] and limiting effects of these

6

symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.*

At the fourth step, the ALJ determined that Graf has no past relevant work. *Id.* at 33. At the fifth step, the ALJ determined that, based on Graf's age, education, work experience, and residual functional capacity, "there [were] jobs that exist[ed] in significant numbers in the national economy that [Graf could] perform." *Id.* Because the ALJ found that Graf was capable of making a successful adjustment to other work, she concluded that "a finding of 'not disabled' [was] therefore appropriate" and denied Graf's request for disability benefits. *Id.* at 34.

Graf requested a review of the ALJ's decision by the SSA's Appeals Council on March 8, 2017. Notice of Appeals Council Action, R. at 1. The SSA Appeals Council "found no reason . . . to review the Administrative Law Judge's decision," and denied Graf's request for review. *Id.* Graf then filed a complaint before this court urging reversal of the Commissioner's decision on January 17, 2018. Compl., Doc. No. 1. Graf filed a Motion to Reverse on June 18, 2018. Mot. Rev., Doc. No. 21. The Commissioner filed a Motion for an Order Affirming the Commissioner's Decision on September 17, 2018. Mot. Affirm, Doc. No. 24.

## III.    Discussion

On review, Graf asserts that the Commissioner: (1) failed to properly evaluate the medical opinion evidence evaluating whether Graf met the listing requirements for listing 1.02(B), (2) misevaluated and misunderstood Graf's fibromyalgia syndrome, (3) failed to make proper weight assessments regarding the opinions of Graf's treating sources, and (4) failed to properly determine Graf's Residual Functional Capacity. Mem. Supp. Mot. Reverse, Doc. No. 2-1, at 2. The Commissioner responds that the ALJ's findings are supported by "substantial evidence" and should be affirmed. Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 1.

For the reasons that follow, I affirm the decision of the Commissioner.

A. <u>Was the ALJ's Analysis at Step Three Deficient?</u>

Graf argues that the ALJ erred in determining that Graf's impairments did not meet the requirements under listing 1.02(B) because "Graf's treatment records and hearing testimony reflect [her] inability to use her hand effectively." Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 32. Specifically, Graf argues that the ALJ provided only a "terse" statement regarding her reasoning for the step three determination. *Id.* at 31. The Commissioner argues that Graf did not meet her burden of showing that her impairments met or medically equaled listing 1.02(B) and that the ALJ's findings are supported by substantial evidence. Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 4.

"Step three of the analysis allows that 'when … an individual's impairment … meets or equals the level of severity described in the [l]isting, and also meets the durational requirement, disability will be found on the basis of the medical facts alone in the absence of evidence to the contrary.'" *Howarth v. Berryhill*, 2017 WL 6527432, at *3 (D. Conn. Dec. 21, 2017) (quoting Social Security Ruling 86-6: Titles II and XVI: The Sequential Process ("SSR 86-6"), 1986 WL 68636, at *3 (Jan. 1, 1986)). "To meet the listing, the impairment must satisfy all of the criteria in the listing…. An impairment that does not meet the listing can nonetheless be medically equivalent 'if it is at least equal in severity and duration to the criteria of any listed impairment.'" *Id.* (quoting 20 C.F.R. § 404.1526 (2015)) (internal quotation marks omitted). To satisfy the step three requirement, "the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration to, the set of symptoms, signs and laboratory findings specified in the listed impairment." SSR 86-6 at *3.

"In determining whether a listing has been met or equaled under step three, the ALJ must consider all relevant evidence in [the] case record…. Additionally, the ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing." *Howarth*, 2017 WL 6527432, at *5 (internal quotation marks omitted). "The failure to articulate reasons can itself be the basis for remand…. This is true when the court 'would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ.'" *Id.* (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)) (internal quotation marks omitted). It is not enough for the ALJ to "summarily dispose[] of step three with conclusory statements that [the claimant] did not meet [a] listing, followed by a recitation of the elements of each listing." *Nieves v. Colvin*, 2016 WL 7489041, at *5 (D. Conn. Dec. 30, 2016); *see also Peach v. Colvin*, 2016 WL 2956230, at *4 (W.D.N.Y. May 23, 2016) ("[T]his court cannot determine whether the ALJ properly considered the [l]istings because his only reference to them is a recitation of the standard.").

Even where the ALJ fails to articulate her reasons at step three, "the court is not required to remand if the ALJ's reasons can be discerned from other steps in the ALJ's analysis or from evidence in the record." *Howarth*, 2017 WL 6527432, at *5 (referencing *Mongeur*, 722 F.2d at 1040). "Where the ALJ's reasons can be thus determined, the court has not required the ALJ to 'have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability' …. In those cases, the ALJ's failure to articulate his reasons can be harmless error." *Id.* (quoting *Mongeur*, 722 F.2d at 1040) (internal citations omitted). Further, "the absence of an express rationale does not prevent [the court] from upholding the ALJ's determination regarding [a

claimant's] listed impairments, [if] portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *Berry*, 675 F.2d at 468.

In this case, the listing is 1.02(B) for disorders of the joints. *See* ALJ Decision, R. at 25, Mem. in Supp. Mot. to Reverse, Doc. No. 21-1 at 31, fn. 1. Listing 1.02(B) requires a showing that a plaintiff has "involvement of one major peripheral joint in each upper extremity (i.e., shoulder elbow or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00(B)(2)(c)". *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.02(B). Inability to perform fine and gross movements is defined as "an extreme loss of function in both extremities." *Id.*

In her step three determination, the ALJ opined that she "considered listing 1.02, but did not find major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." ALJ Decision, R. at 25. The ALJ further opined that "[t]he medical evidence of record, as discussed more fully below, does not show an inability to perform fine and gross movements effectively" and that "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* The ALJ stated that to effectively use their upper extremities, "individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." *Id.* The ALJ stated that the following were examples of being unable to perform fine and gross movements effectively: "the inability to prepare a simple meal and feed oneself, the inability to take care of

personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet or above waist level." *Id.* The ALJ provided no further explanation for her determination and "summarily disposed of step three with conclusory statements … and a recitation of the elements", which is insufficient for step three. *Nieves*, 2016 WL 7489041, at *5, *Peach*, 2016 WL 2956230, at *4. Accordingly, the ALJ's step three analysis was insufficient.

The question, then, becomes whether the reasons for the ALJ's step three decision "can be discerned from other steps" in her analysis "or from evidence in the record" that indicates "that [her] conclusion was supported by substantial evidence." *Howarth*, 2017 WL 6527432, at *5; *Berry*, 675 F.2d at 468. The Commissioner argues, inter alia, that "the ALJ expressly considered [Graf's] allegations concerning her difficulties, and properly found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible to the extent alleged[]" and did not meet or medically equal listing 1.02(B) because Graf's allegations supported findings of difficulty rather than inability to perform certain tasks. Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 5.

The reasoning for that portion of the ALJ's step three decision can be discerned from the record. Although the ALJ did not reference the record for support for her findings in her written decision, there is support for her findings throughout the record. First, State agency physician Dr. Abraham Colb expressly considered listing 1.02 and found that Graf's impairments did not meet or medically equal the requirements of the listed impairment. Dr. Colb found that Graf's "condition is not severe enough to keep [her] from working." Representative Brief, dated 01/21/2017, R. at 56. Furthermore, he found that "based on the evidence in file, [he had] determined that [Graf could] adjust to other work." *Id.* at 57. Finally, he opined that "[t]he

review of [Graf's] physical conditions found that although [she might] experience pain, [she was] still able to move about in a satisfactory manner." *Id.*

Second, even though Graf stated in her testimony that she could not use her hand effectively, there is other evidence in the record to suggest that Graf's assertions regarding her impairments might be overblown. For example, even when Graf complained to her occupational therapist that she could not lift a plate, the therapist observed her hold a laptop, put it in a backpack, zip the backpack, and pick it up. HIT MER, dated 08/20/15 to 12/23/15, from Yale New Haven #2, R. at 1724–25. On another visit, Dr. Steven Bennett observed that Graf had her backpack with her "as usual" and that she had no "apparent difficulty grasping/holding backpack to pick up or put down." Outpatient Hospital Records, dated 10/08/2015, from Greenwich Hospital, R. at 1690.

Finally, Graf reported preparing meals for herself such as salads and smoothies, doing laundry, and washing dishes, which demonstrates that she did not have complete inabilities to perform tasks as required by listing 1.02(B). *See* Activities of Daily Living, dated 08/06/2015, from Claimant, R. at 1202–04.

Because there was evidence that conflicted with Graf's assertions regarding the extent of her impairments, the evidence in the record does not establish that Graf met the criteria required to meet listing 1.02B.

A review of the record provides adequate reassurance that the decision at step three was supported by substantial evidence. Accordingly, the determination at step three was not deficient and does not warrant remand.

B. <u>Did the ALJ Improperly Evaluate Graf's Fibromyalgia?</u>

Graf argues next that the ALJ improperly evaluated Graf's fibromyalgia, "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendon, or nearby soft tissues that has persisted for at least 3 months. Fibromyalgia is a common syndrome." SSR 12-2p. Mem. in Supp. Mot. to Reverse, Doc. No. 21-1 at 35. Specifically, Graf argues that the ALJ misunderstood Graf's fibromyalgia because she "misunderstood the effects and treatment of Fibromyalgia [and therefore] was unable to adequately evaluate Ms. Graf's impairments." *Id.* at 37. Graf further argues that the "ALJ should have called a medical expert if she was unable to evaluate the effects of Ms. Graf's Fibromyalgia," *Id.* The Commissioner argues that "the ALJ found that fibromyalgia and status post right scaphoid fracture were both severe impairments, and expressly considered fibromyalgia and [Graf's[ treatment for fibromyalgia in assessing her functioning." Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 7. Therefore, the Commissioner argues, Graf's "assertion of error is misplaced." *Id.*

Per the Social Security regulations, Graf's subjective statements about her pain, taken alone, are not sufficient for an ALJ to make a disability finding. 20 C.F.R. § 416.929(a). An ALJ must employ a two-step process for evaluating symptoms such as pain.

"First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's" pain. *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order). An ALJ must consider all of the claimant's "symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). The ALJ "will consider all of [a claimant's] statements about [her] symptoms, such as pain, and any description [her] medical sources or nonmedical sources may provide about how the symptoms affect [her] activities of

daily living and [her] ability to work." *Id.* An ALJ must have "objective medical evidence from an acceptable medical source" that shows that a claimant has a medical impairment or impairments that "could reasonably be expected to produce the pain or other symptoms alleged." *Id*.

If the ALJ finds that the first step is met, then she must "'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki*, 534 F. App'x at 75 (citing 20 C.F.R. § 416.929(c)(2)). In doing so, the ALJ considers "all of the available evidence" from medical and nonmedical sources, including objective medical evidence but will not reject a claimant's subjective assessment of the intensity and persistence of her pain "solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. §§ 416.929(c)(1), (2). "However, if a claimant's statements about [her] symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *4 (July 2, 1996)). In doing so, the ALJ should consider the following factors: daily activities; "[t]he location, duration, frequency, and intensity" of the pain; "[p]recipitating and aggravating factors;" "[t]he type, dosage, effectiveness, and side effects of any medication" taken to alleviate pain; "[t]reatment, other than medication" received for pain relief; measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain[.]" 20 C.F.R. § 416.929(c)(3).

Further, an ALJ will consider a claimant's subjective claims of pain "in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [she is] disabled" and will consider "whether there are any inconsistencies in the evidence and the extent

to which there are any conflicts" between the claimant's subjective claims of pain and the "rest of the evidence" including the claimant's history, laboratory findings, and medical source statements regarding pain. 20 C.F.R. § 416.929(c)(4). If an ALJ determines that a claimant does have severe impairments, but the impairments do not meet or equal a listed impairment, then the ALJ "will consider the impact" of the claimant's impairment or impairments and related pain on the claimant's residual functional capacity. 20 C.F.R. § 416.929(d)(4).

"The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'" *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *2)). In making such a determination, the ALJ must provide more than just "a single, conclusory statement" regarding the claimant's credibility or a recitation of the relevant factors, but "remand is not required where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* (citing *Mongeur*, 722 F.2d at 1040).

Here, the ALJ concluded that Graf's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." ALJ Decision, R. at 28. However, the ALJ decided that "[Graf's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.*

The ALJ acknowledged throughout her decision that Graf was suffering from fibromyalgia. *See id.* at 24 (finding that fibromyalgia was a "severe impairment" that Graf suffered); *id.* at 27 (noting disability report noting Graf's reported medical conditions in

disability report, including fractured right wrist, injuries to both feet, condritis, constant pain in limbs and hands, twisted right ankle and knee pain, back pain, and nerve tingling, citing Exhibit 2E, Disability Report – Adult, dated 07/16/2015, from Field Office, R. at 1174); *id*. at 29–30 (noting diagnosis of fibromyalgia and continued reports of pain, citing Exhibit 12F, Hospital Records, dated 09/10/2015 to 10/22/2015, from Steven Bennett, DO). In making this determination, though, the ALJ referenced Graf's reported activities that conflicted with her subjective claims of disabling pain. *Id*. at 29 (noting that Graf stated that her pain was frustrating but that she was able to walk to her physical therapy appointments and could carry her backpack). ALJ Decision, R. at 28 (citing Exhibit 13F, HIT MER, dated 08/20/2015 to 12/23/2015, from Yale New Haven #2, R. at 1735, 1748).

Further, the record also reflects that although Graf continued to allege problems with daily activities such as dressing, bathing, feeding herself, or washing her hair, she also reported preparing meals for herself such as salads and smoothies, doing laundry, and washing dishes. Exhibit 7E, Activities of Daily Living, dated 08/06/2015, from Claimant. R. at 1202–04.

The medical records support a finding that "[u]ltimately, the objective medical findings do not substantiate [Graf's] overly restrictive complaints." ALJ Decision, R. at 32. State agency physician Dr. Abraham Colb found that Graf's impairments did not meet or medically equal the requirements of the listed impairment. Dr. Colb found that Graf's "condition is not severe enough to keep [her] from working." Representative Brief, dated 01/21/2017, R. at 56. Furthermore, he found that "based on the evidence in file, [he had] determined that [Graf could] adjust to other work." *Id.* at 57. Finally, he opined that "[t]he review of [Graf's] physical conditions found that although [she might] experience pain, [she was] still able to move about in a satisfactory manner." *Id.*

Accordingly, the ALJ's decision to discount Graf's claims of pain was sufficiently clear and is supported by substantial evidence in the record and, therefore, remand is not warranted on this issue.

C. Was the ALJ's residual functional capacity determination supported by substantial evidence?

Graf argues that the residual functional capacity determination was not supported by substantial evidence because "the ALJ erred in her weight assignments" and because "the determination lacks impairments as described by plaintiff and treating sources and agency physicians." Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 37, 43. In particular, Graf asserts that the ALJ "cannot ignore, or give no weight at all to, or undervalue, all or part of the opinion of a claimant's treating physician" and that "the ALJ should have limited Ms. Graf to less than medium exertion work" because she "cannot lift or carry objects weighing even 25 pounds and can certainly not lift and carry objects" weighing 50 pounds." *Id.* at 37, 43. The Commissioner responds that the ALJ's residual functional capacity findings are adequately "supported by substantial evidence." Mem. Supp. Mot. Affirm, Doc. No. 17-1, at 4. I agree with the Commissioner, and therefore affirm the ALJ's residual functional capacity findings.

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by his impairment." *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. § 404.1520(b)). The ALJ's determination need not "perfectly correspond with" any medical source opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] . . . finding that [is] consistent with the record as

a whole." *Id.* In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss[ing] the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describ[ing] the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." Social Security Ruling 96-8p, 1996 WL 374184, at *7. Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In making a residual functional capacity determination in the present case, ALJ Bower extensively considered Graf's complaints as well as her voluminous medical records. She noted that Graf's "objective medical findings outweigh [her] overly restrictive subjective complaints" and therefore "the medical evidence of record does not substantiate [her] allegations of disability since the application date." ALJ Decision, R. at 28.

State agency medical consultant Maria Lorenzo, M.D., initially found in September 2015 that Graf had no severe impairments, finding that Graf's "right wrist fracture would not meet the 12-month durational requirement for severity." ALJ Decision, R. at 31 (referencing Exhibit 1A, Disability Determination Explanation/No RFC/Maria Lorenzo, MD, dated 09/11/2015, at R. 1047). In January 2016, State agency medical consultant Abraham Colb., M.D., found that Graf had "severe osteoarthrosis and fibromyalgia and a non-severe right wrist fracture." *Id.* (referencing Exhibit 3A, Disability Determination Explanation/Physical RFC/Abraham Colb, MD, dated 01/13/2016, R. 1057–1058). He opined that Graf "could perform the full range of medium work, but occasionally hand controls, and occasional climbing." *Id.*

Other of Graf's doctors took a more severe view of her impairments. In December 2015, Graf's treating physician, Dr. Steven Bennett, D.O., indicated that he had been treating Graf since September 2015 and that she had "difficulties with prolonged sitting and standing", for which he recommended accommodations, including prescribing Norco and Cymbalta. ALJ Decision, R. at 30. Later, after an examination in May 2016, he opined that Graf "had chronic medical conditions causing some degree of disability." *Id.* at 31 (referencing Exhibit 23F, Progress Notes, dated 03/30/2016, from Steven Bennett, DO, R. at 2004–05). Graf's pain management physician, Andrea Douglas, M.D., completed a medical source statement in November 2016. Dr. Douglas opined that Graf could only sit or stand for 10 minutes at a time and for fewer than 2 hours during an 8-hour workday. ALJ Decision, R. at 31 (referencing Exhibit 20F, Progress Notes, dated 03/03/2015 to 11/03/2016, from Andrea Douglas, MD, R. at 1871). She further opined that Graf would need to shift positions at will, take unscheduled breaks, and that Graf could occasionally lift and carry less than 10 pounds, and that she did not need leg elevation and an assistive device. She could not determine Graf's manipulative limitations because Graf was in too much pain to be fully examined at the time of the appointment. *Id.* She could not determine the number of days Graf would need to be absent from work. *Id.*

With regard to Graf's own complaints, ALJ Bower concluded that Graf's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record. . . ." *Id.* at 28. For instance, the ALJ noted that during one instance when Graf could not drive or undergo any therapy treatment, she was able to walk from the Metro station to the hospital. ALJ Decision, R. at 29 (referencing Exhibit 13F, HIT MER, dated 08/20/2015 to 12/23/2015, from Yale New

Haven #2, R. at 1729). The ALJ also noted that during occupational therapy in October 2015, Graf stated that she could barely get out of bed because of pain and had difficulty with daily activities such as chopping vegetables, shaving, washing her hair, or carrying a water bottle, but that her therapist noted that she could easily grab and hold her backpack and could drive when it was raining instead of walking to the Metro. *Id.* (referencing Exhibit 11F, Outpatient Hospital Records, dated 10/08/2015, from Greenwich Hospital, R. at 1690; Exhibit 13F, HIT MER, dated 08/20/2015 to 12/23/2015, from Yale New Haven #2, R. at 1735, 1748).

In addition, ALJ Bower noted that Graf was capable of walking to her appointments and living alone in a house, as well as preparing simple meals, driving, mowing the grass, cutting vegetables, and walking to appointments, despite the fact that she alleged that she could not shower, have bed sheets on her, cook, clean, drive, or dress herself. *Id.* at 32. The ALJ also noted that objective medical evidence of record did not substantiate Graf's "complaints of highly limited physical functioning." ALJ Decision, R. at 33.

Hence, the ALJ correctly "t[ook] the claimant's reports of pain and other limitations into account" and "exercise[d] discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). She did not, and "[was] not required to[,] accept the claimant's subjective complaints without question." *Id.*; *cf. Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (summary order) ("treating physician's opinions . . . based upon plaintiff's subjective complaints of pain and unremarkable objective tests" were "not 'well supported by medically acceptable clinical and laboratory diagnostic techniques'" and not entitled to "controlling weight") (citing 20 C.F.R. §§ 404.1527(d)(2) , 416.927(d)(2)); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order) ("[W]here the ALJ's decision to discredit a

claimant's subjective complaints is supported by substantial evidence, [the court] must defer to [her] findings.").

In short, Graf's case presented a significant quantity of conflicting medical evidence, with largely normal test results and doctors who disagreed on the nature, severity, and cause of her symptoms. Because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," the ALJ was entitled to "choose between properly submitted medical opinions" and to consider "other substantial evidence in the record," in determining Graf's residual functional capacity. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). ALJ Bower limited Graf to performing "medium work" and held that she can occasionally "push and pull bilateral hand controls, and occasionally climb stairs, ramps, ropes, ladders, and scaffolds" but that "she should avoid concentrated exposure to pulmonary irritants." ALJ Decision, R. at 27. In crafting those limitations, the ALJ relied on substantial evidence in the form of Graf's testimony, *id.* at 28–31and "opinions" by consultative mental health providers and physicians. *Id.* at 31–33.

Graf nevertheless objects that the ALJ "erred in her weight assignments" and that the ALJ's "RFC determination lacks impairments as described by [Graf] and treating sources and agency physicians." *See* Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 37, 43. Those criticisms, however, simply reflect Graf's disagreement with the relative weight the ALJ placed on her additional limitations. "[O]nce an ALJ finds facts, [I] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotation marks omitted; emphasis in original). Here, I hold that a reasonable factfinder need not perforce conclude that Graff requires additional limitations Thus, I affirm the ALJ's findings in those respects.

Under the "very deferential standard of review," I consider the ALJ's residual functional capacity finding to have been based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Therefore, because "there is substantial evidence to support the determination," I affirm the ALJ's decision on that point. *See Selian*, 708 F.3d at 417.

## IV.    Conclusion

For the reasons set forth above, I DENY Graf's Motion for Judgment on the Pleadings (Doc. No. 21) and GRANT the Commissioner's Motion to Affirm (Doc. No. 24). The Clerk shall enter judgment and close the file.

So ordered.

Dated at Bridgeport, Connecticut, this 18th day of March 2019.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge